UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 26-20020-CR-WILLIAMS

UNITED STATES OF AMERICA

vs.

ALEX NAIN SAAB MORAN,

Defendant.
_______________________________/

## FACTUAL PROFFER

The United States of America and the defendant, ALEX NAIN SAAB MORAN (SAAB), agree that the following facts are true and, had this case gone to trial, the United States of America would have proven the following facts, among others, beyond a reasonable doubt:

1. In or about 2015, SAAB made an agreement to launder money and commit fraud with individuals known herein as Co-Defendant 1 and Co-Defendant 3 , as well as Alvaro Pulido Vargas (Pulido), Jose Gregorio Vielma-Mora (Vielma-Mora), Emmanuel Enrique Rubio Gonzalez (Rubio), Carlos Rolando Lizcano Manrique (Lizcano), and others, along with high ranking members of the Venezuelan government.

2. Thereafter individuals known herein as Co-Defendant 4 and Co-Defendant 5 , as well as others, joined the conspiracy.

3. The agreement of the conspirators was to obtain contracts and profit from a Venezuelan public welfare program known as Comite Local de Abastecimiento y Produccion (CLAP) through bribes and other illegal payments, and then secretly distribute and hide the proceeds inside and outside of Venezuela, including to and through the Southern District of

 Defendant's Initials AS
L.I.

Florida.

4. SAAB and Pulido, along with high level Venezuelan officials, were the primary organizers and leaders of the illegal scheme. They, along with others, designed and executed a system of bribes and other illegal payments to public officials in order for entities secretly controlled by the conspirators to be awarded lucrative contracts from the Venezuelan government to import food and medicine under the auspices of the CLAP. However, as part of their corrupt system, other conspirators neglected to deliver in full on the contracts, and instead used fake companies, false invoices, false shipping records, and other fraudulent documents to skim hundreds of millions of dollars for themselves and their associates, as well to conceal their association with the illegal activity and to avoid detection.

5. The scheme was lucratively successful because the conspirators had the approval, participation, and protection of some of the Venezuelan government's highest ranking public authorities, including an individual known herein as Government Official 1A, and Vielma-Mora, and Co-Defendant 3.

6. At the start of the conspiracy, SAAB met with Government Official 1A and received his/her approval to carry out the scheme. In exchange for Government Official 1A's support and protection, SAAB made payments to Government Official 1A inside and outside of Venezuela. SAAB and Government Official 1A also agreed that Co-Defendant 1 would act as Government Official 1A's surrogate and receive illegal payments on Government Official 1A's behalf.

7. SAAB subsequently organized and executed illegal payments to Co-Defendant 1 and others, including payments to and through the Southern District of Florida and elsewhere in furtherance of the conspiracy.



Defendant's Initials_______
L.I

8. At the start of the conspiracy, Government Official 1A's associate, Vielma-Mora, served as the governor of Táchira, a rural state in western Venezuela.

9. In or about early 2016, SAAB, Government Official 1A, Vielma-Mora, and others, began arranging to secretly win a CLAP contract (Contract 1) to provide the people of Venezuela with 10 million boxes of food rations.

10. Contract 1 was awarded and overseen by the Táchira state government through an entity known as Comercializadora de Bienes y Servicios del Tachira (Cobiserta). Contract 1 called for the production and delivery of 10 million food ration boxes to needy Venezuelans in Táchira. National government funds were disbursed from a state-owned investment fund known as Fondo de Desarrollo Nacional SA (Fonden).

11. In or about mid to late 2016, with the approval of Government Official 1A, SAAB met with Co-Defendant 1, Vielma-Mora, Pulido, Lizcano, and others to organize a proposal to design, assemble, and deliver millions of boxes of food rations to needy Venezuelans with funds from the CLAP.

12. As part of the arrangement, SAAB, Vielma-Mora, and others, agreed that in exchange for Vielma-Mora's influence in the awarding of Contract 1 and further contracts to the conspirators, Vielma-Mora would receive a total of approximately $17 million in bribes, kickbacks, and other illegal payments.

13. In fact, SAAB arranged for a series of wire transfers of millions of dollars to corporate bank accounts in Antigua and Panama for third parties on behalf of Vielma-Mora. The transfers were bribes and kickbacks intended for Vielma-Mora in exchange for his past and continued participation in the conspiracy. In affect of interstate commerce, at least a portion of these funds were subsequently transferred to bank accounts in the Southern District



Defendant's Initials AS L.I.

of Florida to further promote the bribery scheme and to conceal the true source, nature, and purpose of the proceeds.

14. In or about October of 2016, pursuant to the influence of Government Official 1A, Vielma-Mora, and others, Contract 1 was awarded by Cobiserta to Group Grand Limited (GGL), a Hong Kong shell company secretly controlled by SAAB and Pulido, but publicly associated with people acting on their behalf.

15. SAAB and Pulido had full control of GGL and used it for the primary purpose of concealing their connection to the CLAP. GGL had bank accounts but did not produce food, medicine or any products. SAAB and Pulido employed others to operate GGL's bank accounts at their direction, and to help them to hide their association with GGL.

16. Subsequent to their use of GGL for Contract 1, SAAB and Pulido utilized other, similar shell companies to evade sanctions and secretly win a series of additional CLAP contracts for food and medicine, and to receive Venezuelan government funds outside of Venezuela on the behalf of the conspirators. Other shell companies used by SAAB and his co-conspirators for these purposes included Asasi Foods FZE and Mulberry Proje Ve Dis Ticaret.

17. Surrogates employed by SAAB and Pulido then moved the proceeds of the CLAP contracts, via wire transfers and cash payments, to various co-conspirators and associates around the world, including to and through the United States.

18. For example, SAAB funded the bank accounts of certain companies under the control of Co-Defendant 3, Pulido, Rubio, and others, outside of Venezuela. Part of the funds were then transferred from those companies to pay CLAP food suppliers like Co-Defendant 5, including to and through accounts in the Southern District of Florida.



Defendant's Initials AS

L.I

19. Other illegal payments were wire transferred to bank accounts secretly controlled by co-conspirators in locations such as Antigua, Bulgaria, Liechtenstein, Marshall Islands, Montenegro, Switzerland, Turkey, United Kingdom, and United Arab Emirates.

20. In Bulgaria and Liechtenstein, SAAB and Pulido utilized a Swiss financial advisory firm to secretly set up entities and bank accounts for the sole purpose of laundering funds involved in their illegal scheme. The accounts are described in Appendix A (attached hereto and incorporated herein for all purposes) and were funded with proceeds and facilitating funds of the conspirator's illegal scheme. The funds in the accounts are owned and/or associated with SAAB and Pulido, but their association was concealed by the Swiss financial advisory firm and disguised as corporate accounts controlled by a surrogate of SAAB and Pulido. The funds were used by SAAB, Pulido, and other conspirators to promote and facilitate the bribery and fraud at the heart of the scheme, as well to spend and to hide proceeds from the detection of authorities.

21. With the continued support of Government Official 1A, SAAB and his co-conspirators continued to secretly win CLAP contracts by utilizing shell companies publicly identified as belonging to other people, such as GGL, Asasi Foods, and Mulberry. SAAB profited approximately $195 million from at least six contracts that were awarded to the conspirators. Funds were released to the conspirators' shell companies by Fonden and other government agencies under the influence of Government Official 1A, such as Banco de Desarollo Económico y Social de Venezuela (Bandes) and Corporación Venezolana de Comercio Exterior (Corpovex).

22. Not later than in and around mid 2019, SAAB, Government Official 1A, Co-Defendant 3, and others, altered the payment structure of the illegal scheme by arranging for



Defendant's Initials AS
L.I

the conspirators to receive compensation for CLAP contracts through deliveries of Venezuelan oil, gold, and other natural resources.

23. In furtherance of the scheme, SAAB, Co-Defendant 3, Co-Defendant 4, and others, arranged for a series of maritime vessels to pick up, transport, disguise, and sell millions of barrels of crude oil from Petróleos de Venezuela, S.A. (PDVSA), Venezuela's state-owned oil company. Proceeds of these illegal sales were, in part, transferred to and through bank accounts in the United States to further promote the illegal scheme, including the Southern District of Florida.

24. On or about June 12, 2020, SAAB was arrested and confined in Cape Verde, but the criminal scheme continued with Pulido assuming SAAB's leadership role. While in custody, SAAB believed he would continue to profit and be paid from his prior participation in the CLAP scheme. Pulido, Co-Defendant 3, Co-Defendant 4, Co-Defendant 5, and others continued to arrange for maritime vessels to pick up, transport, and sell millions of barrels of PSDVSA oil, and to skim the subsequent proceeds.

25. Upon SAAB's return to Venezuela in December of 2023, through February of 2026, SAAB joined the government of Venezuela in an official capacity and accepted funds from earlier CLAP contracts. At the same time, he continued to assist and took directions from Venezuelan officials and their representatives who were engaged in other illegal schemes, including Government Official 1A.

The above facts would have been proven through the testimony of cooperating and law enforcement witnesses, preserved emails and chat conversations, business records, and bank records. The facts described above are not intended to be a complete recitation of the facts of this case and are merely intended to form a basis for the undersigned defendant's

 Defendant's Initials ______ L.I

knowing and voluntary plea of guilty to the violation of Title 18, United States Code, Section 1956(h), as charged in the Indictment.

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

Date: 8·6·2026 By: ____________________
MONIQUE BOTERO
ASSISTANT UNITED STATES ATTORNEY

MARGARET A. MOESER
CHIEF
MONEY LAUNDERING, NARCOTICS AND FORFEITURE SECTION
DOJ CRIMINAL DIVISION

Date: 8/6/26 By: ____________________
JOSEPH PALAZZO
DEPUTY CHIEF

Date: 8-6-26 ____________________
NEIL SCHUSTER, ESQ.
COUNSEL FOR DEFENDANT

Date: 8-6-26 ____________________
JOSEPH SCHUSTER, ESQ.
COUNSEL FOR DEFENDANT

Date: 8-6-26 ____________________
ALEX NAIN SAAB MORAN
DEFENDANT



Witnessed by ____________________

## FACTUAL PROFFER - APPENDIX A

**Bulgaria accounts and funds involved in money laundering**

| | Abbreviated Account Number | Listed Account Holder |
|---|---|---|
| 1. | Investbank_6109 | Adon Trading FZE |
| 2. | Investbank_5206 | Asasi Foods FZE |
| 3. | Investbank_6108 | Atlas Food FZE |
| 4. | Investbank_6101 | FB Foods C.A. Limited |
| 5. | Investbank_3305 | Max Power Engineering LTD |
| 6. | Investbank_8408 | Mulberry Proje Ve Dis Ticaret A.S. |
| 7. | Investbank_6401 | Salva Foods FZE |

**Liechtenstein accounts and funds involved in money laundering**

| | Abbreviated Account Number | Listed Account Holder |
|---|---|---|
| 8. | Union_0851 | Adon Trading FZE |
| 9. | Union_0866 | FB Foods LLC CA |
| 10. | Union_securities | Mulberry Proje Ve Dis Ticaret A.S. |

Defendant's Intials ____ L.I